The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is Jane Doe v. Harvard Pilgrim Health Care, Incorporated et al. Appeal number 18191879. Attorney Rafik, good morning. You may proceed. Good morning, Your Honor. Thank you. As I said, my name is Molly Rafik and I'm here today along with Sarah Burns representing Jane Doe. With your permission, I would like to reserve two minutes for rebuttal. You may. Thank you, Your Honor. Try to speak as loudly as possible.  I intend to focus on two sets of issues today. I will show that there was clear error in this case based on the District Court's misunderstanding of the applicable guidelines as well as the nature of Jane's medical condition and why that condition necessitated the treatment within the safety of a 24-hour structure. And second, I will address the need to allow for Rule 52 bench trials with or without live testimony to avoid clear error in the future. As of last Friday, bench trials in ERISA de novo review cases are now permitted by five of the six circuit courts who have adopted the clear error standard of review. Turning to the guidelines. Excuse me, Counsel. Is the question whether bench trials are permitted or whether the District Court has discretion as to whether or not to convene a bench trial in any given case? The question, I believe, before the Court, Your Honor, is the second. Whether this Court would allow District Courts the option of convening a bench trial is one of the tools in their arsenal in meeting the mandate of Doe 1 to conduct an independent decision. And I say decision, not review. And is it your position that we have up to this point disallowed a District Court from exercising that option? So I don't believe that that has explicitly been said. No, neither do I. That's why I'm asking. No, I don't believe that's been said. And I actually believe that Doe 1 spoke to the importance of bench trials or the relevance of bench trials. I think the concern that's been raised in this case is that Orndorff says that there are no disputed facts in an ERISA case and that it's not. And I think the exact language is that judicial review, de novo review, does not in itself entitle, claim it to a trial or to put on new evidence. I think that's true. I don't think there's a presumption that a bench trial should be allowed. But I believe it would be helpful if this Court were to explicitly state that District Courts could perform a bench trial if needed to parse through the evidence in the record, to tease out the facts, to engage with the parties as to the relevant evidence. And it would be helpful for us as parties, when you're dealing with these 1,000-page ERISA records, to be able to offer to the Court, if it's a bench trial on documents, the documents that we believe are paramount in this case. And if there's live testimony, and I think that live testimony, if a party wants live testimony, this Court could hold that party to the same standard it holds a party enlist in. You have to offer a very good reason for live testimony to the District Court. I'm afraid I don't understand, Counsel, your suggestion for a bench trial without live evidence. What you just said is that that would be a useful way of allowing a party to highlight what evidence he or she thinks is most important. But I thought that was the purpose of the pretrial memoranda, the briefs, the other filing, the paper filings that are made with the District Court, to do exactly that. That's correct, Your Honor. We requested a bench trial with live testimony. I believe, however, that Rule 52 bench trials are flexible, and that District Courts can hold a bench trial in any format they want to. In the Ninth Circuit, it's often an introduction of documents. In the Second Circuit and in the Seventh Circuit, live testimony has become one of the options that are used. And judges decide, based on what the record shows, what they want to do. Ms. Rafik, I'm having trouble understanding exactly what you're talking about. It seems to me the central issue is whether the record that the District Court makes the de novo determination on is limited to the record that was before the ERISA fiduciary, so that it's in the nature of an administrative review. And you can have briefs, you can have oral argument, you can point out what documents are important, you can offer argument concerning them. That's all in the nature of ordinary administrative review that courts are used to conducting, and you can have all of that. It seems to me the issue where you're asking us to go differently is to entertain the possibility that we would abandon the model of review on the administrative record and actually allow the District Court to supplement the record, and to supplement it not on issues of conflict of interest, but to supplement it on issues of the merits, so that, for example, you would have different facts and different medical opinions before the District Court than you had before the ERISA fiduciary. And what is the authority from either our circuit or the Supreme Court for doing that? So, Your Honor, I would start by saying that I start with the proposition or the presumption that the record before the reviewing court is always going to be the administrative record, the record that was before the insurance company at the time they made their decision. Now, what would a bench trial do other than allow counsel to point to parts of that record to make arguments and everything which you were able to do here? A bench trial is slightly different, Your Honor, in this sense. As a lawyer, we can offer to the court, and the court can engage with various aspects of the record that are unclear. Essentially, what we had at the District Court was an appellate argument in the trial court. We had briefing and a 15-minute oral argument, but a bench trial would really, for instance in this case, allowed us to really talk about the levels of care of mental illness and how they corresponded with the levels of care, the optimum level of care guidelines in this case. But, Your Honor, just to get to your original question about the expansion of the record, in Orndorff, this court said, and in Liston, if the party proposes a very good reason, the record can be expanded. You can use that same standard for a bench trial. That's the standard the Second Circuit uses and the Ninth Circuit uses to expand the record before the court. But there was no proffer here to expand the record. We do that as a bench trial on this record. That's exactly right, Your Honor. Yes, and what's the purpose of that? What you've described as being able to do in a bench record is nothing more or less than what you can do in oral argument before the District Court, should you be able to convince the District Court to give you the amount of time that you think that would consume. If the District Court thinks that it's a good use of its time and in the interest of justice to say the plaintiffs can take the morning to argue this case from the administrative record, and the defendant can take the afternoon, there's nothing that prohibits that. You don't have to have a bench trial to do that, and you can feast your heart's delight on the interstices of the record. I believe you're right, Your Honor, but I don't believe that's clear to the District Courts right now that that's what we can do, because we've been working under this presumption that these cases are summary judgment cases. Therefore, we exchange briefs on the record, and we do a 15-minute oral argument. Clarity as to what Your Honor just said and the option for a bench trial would assist District Courts in giving them this option. I think you should move on, Counsel, because frankly, I think we're talking about a solution in search of a problem. I don't disagree, Your Honor. I just wanted to raise the bench trial as an option, because frankly, I believe that there is clear error on this record for two fundamental reasons. The first being that the court misunderstood and misapplied the level of care guidelines here. As the NAMI brief correctly points out, there's really three levels of care for mental illness. Mental illness is not a world that we all live in naturally. It's a world that needs a little bit of explaining, and the treatment is different than that for physical conditions. You have inpatient hospitalization that are for individuals who are an imminent threat to themselves and others and need 24-hour nursing. You have residential care, which is what Jane needed in this case, but it's for people who don't pose an imminent threat to themselves and others, but they need the safety of a 24-hour structure. Then there's the partial hospitalization program, which, relevantly in this case, you need the support network in the evenings and the weekends of people who can help you, and Jane didn't have that here. The district court, in evaluating Jane's eligibility for benefits, merged the inpatient guidelines, the level of care guidelines, with those for residential treatment. It allowed the court to conclude that once Jane was stable on medications and not exhibiting acute symptoms, such as suicidal ideation, she was able to step down to a partial hospitalization level. I thought that Judge Casper, in her decision, did discuss the importance and relevance of the 24-hour structure and decided that it was not shown to be reasonably necessary in this case. She did, Your Honor. She correctly cited the correct guidelines, but the district court decided that Jane was able to be stepped down to a lower level of care based on the fact that she was no longer posing an imminent threat to herself and others. While she cited the correct guidelines, she applied the guidelines for inpatient treatment. The guidelines explicitly state that in order for residential treatment to be medically necessary, you cannot be at an imminent threat to yourself and others. The residential level of care guidelines speak to treatment, recovery, and safe and effective treatment, and that's really exemplified, Your Honor, by Harvard Pilgrim's approval of Jane's initial admission to Riggs and its approval of the second admission. I would point to the court, to Dr. Edward Darrell, the independent doctor hired by Harvard Pilgrim, to evaluate Jane's second admission because he evaluates Jane's treatment and applies it specifically to the guidelines. There's two factual errors that the district court made that really were the linchpin of her decision in this case, that really go to the heart of this case. The first was that the district court said that Jane could be discharged to a lower level of treatment because her parents were caring and supportive. Loving parents alone are not sufficient to allow someone to be discharged to a lower level of care. In Jane's particular case, her parents triggered her psychosis. Dr. Darrell best summarized this dynamic in his report when he said, given the chaotic family dynamics, further family work was necessary in a control setting since the claimant quite consistently became more psychotic and unpredictable in their presence. Counsel, just to refresh my recollection, the doctor to whom you're referring never spoke to the period that we're concerned with here. He was talking about her second period of hospitalization, wasn't he? That's absolutely correct, Your Honor. I just wanted to get that clear in my mind. Yeah, he was, Your Honor, but the relevance of his report goes to this. He applied the facts of Jane's case to the guidelines. And as Your Honor correctly noted during the argument in Doe 1, the second admission was more of the same as the first admission. So there are three periods of time at issue here, when Harvard Pilgrim approved Jane's treatment to Riggs and when Harvard Pilgrim approved the second admission. And the standard they used when they approved benefits is markedly different than the standard they used when they denied benefits. And that's why Dr. Darrell's report is incredibly helpful, as is United Behavioral Health, the rationale that they used to approve benefits. They never said. They explicitly said Jane was not suicidal. Yes, Your Honor. Yes, Ms. Rafiq, could you tell us something about the OPP report, precisely what that is? I could not tell whether that was a neutral report or someone who's in one camp or the other. So that report, Your Honor, has become a little bit of a lightning rod in this case. It was an external review done through the state of Massachusetts by a doctor whose name is not in the record. And it was done before counsel was involved.  May I finish, Your Honor? Yes. Oh, thank you, Your Honor. So it's an independent review that was done back in early February without the benefit of the full record. And what do you mean by independent review? It's a doctor chosen by the Commonwealth to review the record. And I would just note, Your Honor, that we tried to get in the OPP record in front of Judge Casper because we felt it was important that Judge Casper understood what that reviewer reviewed when they made its decision. But I will say they applied the acute level of guidelines saying that Jane did not have acute symptoms and that she did not require 24-hour nursing. That's the wrong standard. And what portion of the record was the OPP that we now have as a record did the OPP not have? The OPP's decision ended effective February 12th, I believe. So this record was expanded in Doe 1 to go through February of 2016. Thank you. Thank you, Your Honor. Thank you. If Attorney Rafik could mute both devices and if Attorney Schreckinger could unmute. Good morning, counsel. Good morning, Your Honor. Stephen Schreckinger representing Harvard Pilgrim and the Harvard Pilgrim group plan. As the court just heard, Doe raises two principal arguments on appeal. First is that the district court holding that a continued stay at Austin Riggs after February 12th was not medically necessary is unsupported by the evidence and therefore was clear error. And the second argument is that Doe is entitled to a remand for Rule 52 bench trial, which I understood to be from her brief on the papers. Both of these arguments fail because they ignore what this court instructed the judge to do below in Doe 1. And that is what the judge did on remand. The judge did what she was instructed. She weighed the facts, such as the facts relating to Doe's extended trips away from Riggs multiple times for multiple days and the implications of that. She resolved conflicts in the evidence, such as the expert opinions on both sides, and she rendered careful and extended findings with explicit citations to the administrative record. But even if all of that is true, Mr. Schreckinger, what of Ms. Rafik's point, her argument as I understood it, wasn't that the judge didn't do any of that, but that the judge applied the facts that she discerned using the wrong standard, using, in effect, the Level 1 standard of care? Well, the record and the judge's findings don't support that. Why not, Your Honor? Well, medical necessity, which is the issue in this case, wasn't medically necessary to remain at Riggs. As this court said in Doe 1, is a factual finding. And the standard of review that this court applied, or said would apply, is clear error. That's true, but medically necessary has to be read in light of what the criteria and the standards are for level of care. And the argument that I'm trying to get you to address, I don't know if the argument's correct or not, but I think I understood Ms. Rafik correctly. She's arguing that the judge used the wrong definition because she was, in effect, saying that it wasn't medically necessary within the purview of what you would have to show to get a Level 1 admission. Whereas that's not this case. Well, we're talking about whether, as of February 12th, her condition was such that it was no longer medically necessary for her to remain at Riggs. The guidelines say that in order to have a continued stay at Riggs, Doe has the burden of proof that the conditions that led her, that she continued to need 24-hour structure. And that she wouldn't put herself at, she wouldn't be at imminent risk if she was stepped down to a partial hospitalization program. And the trial judge extensively addressed both of those issues. And as I said, she looked at the fact that Doe left Riggs, I think, for 21 different days without any supervision. And the court found that to be indicative of the fact that she didn't need 24-hour structure. And it's not just the court alone, the court below alone made these determinations. This started out with two Harvard Pilgrim doctors concluding that while the admittance of Jane in January made sense, that as of February 5, she could be safely transitioned. Excuse me. As I understand it, the court below based its conclusions pretty much on the opinion of Dr. Rubenstein. Am I correct? Not at all, your honor. No, not at all. She barely touches on Dr. Rubenstein's opinion. Instead, she independently went through the medical records. She looked at the Riggs records from Dr. Mintz, the clinician who was making the diagnosis and prescriptions, and Dr. Kerkorian. There were five doctors, as I understand it, that issued opinions. The only one that said that residential treatment was not warranted was Dr. Rubenstein. The other ones were of a different view. No, that's not correct, your honor, if I may. This started out with two Harvard Pilgrim physicians having peer-to-peer interviews with Dr. Kerkorian and Dr. Mintz and concluding that Doe could begin safely transitioning to partial hospitalization. Doe appealed that decision, and under the guidelines, that was sent to an independent doctor having no affiliation with Harvard Pilgrim. That was Dr. Bennett. Dr. Bennett concluded that Doe could safely transition, and then that was appealed to the Commonwealth Office of Patient Protection, the OPP, and they went out and hired an expert psychologist who specializes in adolescent behavior, and he concluded that Doe could safely be transitioned. And then the record was expanded to include Dr. Rubenstein's opinion, which was in 2016. And he also concluded the same thing, but notwithstanding all of those opinions which said that she could safely be transitioned, the court independently went through the medical records and the nursing notes, and she pointed out that Doe rarely accessed the nurses at night and that she could safely navigate, even when things became more intense, she could safely navigate those circumstances. That is, I mean, this court said medical necessity is a factual determination. You know, this is a very complicated record, and I'm certainly not a doctor, but I get the impression that these suicidal tendencies of a plaintiff came in and out, that it didn't seem in any way predictable. Am I correct on that? The court found and other doctors found that they subsided to the point where she could be safely treated in a lower level of care, and I think Doe postures this as... Well, were they predictable? I mean, they seemed to come in and out at different times. That doesn't mean, Your Honor, that they can't be treated in a lower level of care. And I think that Doe postures this as either residential treatment or nothing, and it's residential treatment or it is a step down from that, which everybody was recommending, a partial hospitalization program, which is an intense structure. It's not living away from home 24 hours a day, but it's intense psychotherapy at a hospital during the day. And this court has said at its heart an ERISA case is a contract case, and the guidelines say that if it is no longer medically necessary and that she can safely be transitioned to a lower level of care, then that is what the contract permits or requires. And it's not just the district court making that finding. It was five physicians as well. And it's all supported in the record, so unless this court is going to do a de novo review, Doe has an impossible burden to get to clear error. I'm happy to address the Rule 52 hearing. The standard here, I believe, is abusive discretion, and as we pointed out in our papers. Could you respond to the point that most of the expert reports that you pointed to, including the OPP, were completed before subsequent events occurred that then led to the supplementation of the record? So they were not based on the entire record. Five minutes remaining. The judge below addressed this and went through each of the Crawford Doe expert opinions. Although there were opinions that postdated the time at issue, most of them focused on the period that postdated the administrative decision. And, for instance, Doe says there's an inconsistency between what Dr. Durell found and the decisions made by Harvard Pilgrim on the first admission. But he was focusing on the period under review for him, which was June 24 to August 7. And if you look at the medical record, at the end of June, Riggs was finally able to obtain an EKG because they had suggested to her for months that she might have a seizure disorder. Who is they? Dr. Mintz at Riggs was saying, and he was reluctant to prescribe medications because he was afraid she had a seizure disorder, but they didn't take the steps to get her an EKG from January until June. In June, that comes back, and she wanted a diagnosis of a seizure disorder. This is in the record because she thought that would be treatable. And when she found out she didn't have a seizure disorder, she deteriorated, and that's what led to her inpatient at Berkshire and then her release back to Riggs. But to the extent that, as I read plaintiff's brief, she's suggesting that Harvard Pilgrim made inconsistent decisions here. Dr. Durell was like Dr. Bennett, an independent reviewer. Harvard Pilgrim had originally denied coverage for the second admission because it wasn't preauthorized as required. And so there was a denial. It was appealed to Dr. Durell. Dr. Durell makes a decision that she needed a 24-hour structure at this period of time, and under the guidelines, Harvard Pilgrim had to live with that decision, and it did, and it paid for her second admission. But as Judge Casper said, that he does not address, and he says he is focusing solely on the period between June 24 and August 7, not on what was taking place in January and February. I hope that addresses your question. If I can just follow up on the bench trial. This was waived. Doe did not ask for a bench trial below. She asked for an evidentiary hearing with all of the physicians without explaining how she was going to call, or I was going to be able to call the OPP physician, who by statute is unidentified. And it was first raised, as we pointed out, on a motion for reconsideration, and the court denied it. But as Judge Selye was getting to, this is exactly what she's asking for in a bench trial is exactly what the procedure is in this circuit, which is to review the evidence, resolve conflicts in the evidence, and to make findings of fact. And so even if it's not waived, she gets precisely what she's actually asking the court to do, except she wants another bite at the apple. But she is getting, and not only is she getting that, she's getting precisely the review that this court ordered in Doe 1. This court sent it back for the judge to review the expanded administrative record. The judge did that. She made findings with respect to the additional medical opinions from Dr. Harris and from Dr. Rubenstein and the additional letters from Dr. Kerkorian. And she found that weighing all of that evidence, that Doe could safely be transitioned to a lower level of care. But Doe simply chose not to accept that contractual determination. That's time. With the court's permission, I'd like to pick up on where Judge Chiata and Judge Torea were going regarding the record. In Doe 1, this court changed the scope of the record or the time frame it issued in February 2016, and it asked the district court to consider five expert opinions. Dr. Kerkorian, Daryl, Harris, Klaken, and Rubenstein. The judge, starting on page 24 of her opinion, in a section entitled Medical Opinions, does that to a point. She addresses four out of those five opinions. The fifth one she does not address is Dr. Rubenstein's. And yet, Judge Torea, you're correct about my argument. The linchpin of Judge Casper's decision is based solely on Dr. Rubenstein's report. And that is the one expert report that she does not address in her opinion. She doesn't cite explicitly to Dr. Rubenstein, but the findings that she makes, Jane's parents are caring, Jane could live autonomously because she was able to take trips away from Riggs. Riggs was bad for Jane because she was triggered by other patients there. And Riggs took too long to offer Jane good care, such as prescribing Clozeril or the EEG my brother mentioned. Those facts all come from Dr. Rubenstein's report, even if they are not cited. And that is the one report that the court does not explain to this court the reasoning that she chose to get there. The only way appellate review can be effective is if this court understands how the district court came to the decision they did. And while Judge Casper does spend many pages walking through the facts of this case, many of those facts are parsed from the record as we identified in our briefing. And I would like to leave the court with one important fact because it really goes to the heart of this case. This case, the record is clear that Jane needed residential treatment. And while there were doctors at the beginning who said that Jane did not, those doctors in every single one of their reports used the word acute symptoms and a 24-hour nursing. That is the inpatient level of care. That's why we believe those doctors' opinions are irrelevant, including the OPP examiner. That's time. Thank you, Your Honors. Thank you, Counsel. That concludes the argument in this case.